**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLORADO**

SONNY WARD,

      Plaintiff,

  v.

                                Civil Action No.: 1:26-cv-
                                _____

THE CINCINNATI INDEMNITY COMPANY,

      Defendant.

**CIVIL COMPLAINT AND JURY DEMAND**

The Plaintiff, Sonny Ward, by and through legal counsel, Conduit Law, LLC, hereby submits the following Complaint and Jury Demand against Defendant The Cincinnati Indemnity Company, and in support thereof states and alleges as follows:

**PARTIES, JURISDICTION, AND VENUE**

1. Plaintiff Sonny Ward ("Plaintiff" or "the insured") is a natural person. At the time of the July 24, 2025 collision described below, Plaintiff resided in the State of Colorado, and Plaintiff continues to reside in, is domiciled in, and is a citizen of, the State of Colorado at the time this Complaint is filed.

2. Upon information and belief, at all times relevant to this action, Defendant The Cincinnati Indemnity Company ("Defendant" or "Cincinnati") was and is a corporation organized and existing under the laws of the State of Ohio, with its principal place of business in Fairfield, Ohio, and authorized to transact the business of insurance in the State of Colorado. For purposes of 28 U.S.C. § 1332, Defendant is a citizen of the State of Ohio.

3. At all relevant times, Defendant purposefully availed itself of the privilege of conducting business in the State of Colorado, including by issuing and administering commercial motor-vehicle insurance covering Colorado risks and Colorado operations, adjusting and handling claims arising from Colorado motor-vehicle collisions, and collecting premiums in connection therewith.

4. Defendant is a foreign insurance company transacting the business of insurance in Colorado and may be served with process through the Colorado Commissioner of Insurance, Colorado Division of Insurance, 1560 Broadway, Suite 850, Denver, CO 80202.

5. Complete diversity of citizenship exists. Plaintiff is a citizen of Colorado and Defendant is a citizen of Ohio. This Court therefore has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because the action is between citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

6. The amount in controversy exceeds $75,000, exclusive of interest and costs, for the following reasons, among others. Plaintiff's documented damages total approximately $199,979.53, consisting of approximately $43,306.53 in past medical expenses, approximately $21,673.00 in reasonably necessary future medical expenses as projected by a board-certified orthopedic surgeon, and substantial non-economic damages. The tortfeasor's $100,000 bodily-injury liability limits have been exhausted, leaving underinsured motorist benefits of approximately $99,979.53 at issue under the Policy described below. Plaintiff further seeks, pursuant to C.R.S. § 10-3-1116(1), recovery of the covered benefit plus two times the covered benefit, together with reasonable attorney fees and court costs, all of which constitute "actual damages" properly counted toward the amount in controversy. When the benefits owed, statutory two-times damages, and attorney fees are aggregated, the amount in controversy substantially exceeds $75,000.

7. Venue is proper in the United States District Court for the District of Colorado pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this District, including the underlying motor-vehicle collision, which occurred in Nederland, Boulder County, Colorado, and Defendant's handling, evaluation, and adjustment of Plaintiff's first-party insurance claim arising from that Colorado collision.

8. Colorado law governs this dispute. The insured resided in Colorado; the collision occurred in Colorado; Plaintiff's injuries were sustained and treated in Colorado; Defendant acknowledged and adjusted the claim as a Colorado loss under the Policy's Colorado uninsured motorist endorsement; and Colorado has the most significant relationship to the parties, the occurrence, and the claims-handling conduct at issue.

## GENERAL FACTUAL ALLEGATIONS

### A. The Collision

9. On or about July 24, 2025, at approximately 11:40 a.m., Plaintiff was lawfully operating a Honda HR-V southbound on S. Highway 119 at or near its intersection with Lakeview Drive in Nederland, Boulder County, Colorado, where he was stopped and waiting to turn left onto Lakeview Drive.

10. At the same time and place, Richard Newman ("the tortfeasor") was operating a Ford F-350 pickup truck directly behind Plaintiff. The tortfeasor failed to keep a proper lookout, failed to maintain a safe following distance, and violently crashed into the rear of Plaintiff's stopped vehicle.

11. The force of the impact propelled Plaintiff's vehicle more than 200 feet forward before it came to rest on the shoulder. The tortfeasor's vehicle then continued forward and crashed into a third, unoccupied vehicle that was properly parked on the shoulder. Responding paramedics documented intrusion of greater than 18 inches on all sides of the rear of Plaintiff's vehicle, with the intrusion extending into the back seat.

12. The tortfeasor was cited by the Boulder County Sheriff's Office for Careless Driving Causing Bodily Injury, and the investigating officer attributed the collision to the tortfeasor's careless driving.

13. The tortfeasor's negligent and careless operation of his vehicle was the sole and proximate cause of the collision and of Plaintiff's resulting injuries and damages.

14. Plaintiff was not comparatively negligent, and Plaintiff did not cause or contribute to the collision.

### B. Plaintiff's Injuries, Treatment, and Damages

15. Plaintiff, who was restrained, briefly lost consciousness in the collision. He was placed in a cervical collar at the scene and transported by ambulance, under spinal precautions and with a limited trauma activation, to the emergency department at Boulder Community Health.

16. Emergency CT imaging performed that day documented objective traumatic injuries, including mild bilateral pulmonary contusions and a subtle cortical offset of the coccyx representing a probable nondisplaced fracture. Plaintiff was diagnosed with, among other things, lumbar

strain, bilateral pulmonary contusions, a probable nondisplaced coccyx fracture, an unspecified intracranial injury with loss of consciousness, cervicalgia, and dorsalgia.

17. Plaintiff's injuries and symptoms include, among others, persistent neck pain, low-back and tailbone pain, anterior and posterior rib pain, right shoulder pain, radiating left-arm and left-leg numbness and paresthesia, headaches, sleep disruption, and post-traumatic anxiety and depressive symptoms.

18. Plaintiff's subsequent treating examinations documented further objective findings, including restricted cervical, thoracic, and lumbar range of motion with muscle spasm; positive cervical compression, foraminal compression, and distraction testing; and reduced (4/5) strength in the left upper extremity. Plaintiff scored 56% — reflecting "significant activities of daily living disability" — on both the Neck Disability Index and the Revised Oswestry Low Back Disability Questionnaire.

19. Plaintiff's injuries, treatment, and causation were evaluated by Nicholas ("Nick") Sacksteder, M.D., a board-certified orthopedic surgeon with Axiom Medical Consulting, who, following a comprehensive record-by-record review, issued a written Causation Analysis and Medical Cost Projection signed on or about June 27, 2026.

20. Dr. Sacksteder concluded that Plaintiff was in his usual state of relative health and would have remained so but for the July 24, 2025 collision, which directly precipitated Plaintiff's neck pain (a whiplash-associated injury), numbness and weakness in the left upper extremity, low back pain, numbness in the left lower extremity, and headaches. Dr. Sacksteder explained that rear-end collisions of this type characteristically produce cervical acceleration-deceleration (whiplash) injuries, and that the more-than-200-foot displacement of Plaintiff's vehicle and the documented intrusion at the scene are consistent with the severity of Plaintiff's presentation.

21. Dr. Sacksteder recommended reasonably necessary future care, including MRI of the cervical and lumbar spine and EMG with nerve-conduction studies to rule out traumatic disc herniation and radiculopathy (because the CT imaging Plaintiff underwent does not adequately visualize disc and soft-tissue structures), a course of physical therapy, cognitive-behavioral therapy for chronic pain, medication management, and pain-management consultation for epidural steroid

or facet-joint injections, and quantified Plaintiff's reasonably necessary future medical expenses at approximately $21,673.00.

22. As a direct and proximate result of the collision, Plaintiff has incurred past medical expenses of approximately $43,306.53.

23. As a direct and proximate result of the collision, Plaintiff has suffered and will continue to suffer non-economic damages, including pain and suffering, loss of enjoyment of life, inconvenience, emotional distress, and impairment of the quality of life, as well as physical impairment.

### C. *The Policy and Plaintiff's Entitlement to UIM Benefits*

24. At the time of the collision, Plaintiff was employed by Centaur Associates Inc. ("Centaur") and, as Defendant itself has acknowledged in writing, the collision occurred during the course and scope of Plaintiff's employment with Centaur.

25. Defendant issued to Centaur a commercial automobile insurance policy bearing policy number EPP 063 17 75 / EBA 063 17 75, effective October 8, 2024 to October 8, 2025, which includes Colorado Uninsured Motorists Coverage — Bodily Injury (Endorsement AA 285 CO 07 17) (the "Policy"). Defendant assigned claim number 4614801 to Plaintiff's underinsured motorist ("UIM") claim.

26. The Policy provides uninsured/underinsured motorist ("UM/UIM") bodily-injury coverage with a limit of insurance of, upon information and belief, no less than $100,000.

27. At the time of the collision, Plaintiff qualified as an "insured" for purposes of the Policy's Colorado UM/UIM endorsement. Defendant has never disputed Plaintiff's status as an insured; to the contrary, Defendant acknowledged Plaintiff's UIM claim, investigated and adjusted the claim on its merits, granted written consent to Plaintiff's settlement with the tortfeasor's liability insurer, and extended an offer of UIM benefits.

28. The tortfeasor's bodily-injury liability insurer, The Hartford, tendered its full $100,000 per-person policy limits to Plaintiff, with Defendant's prior written consent given on or about May 21, 2026, and those limits have been exhausted.

29. Because the sum of the liability limits available to the tortfeasor at the time of the accident is less than the amount Plaintiff is legally entitled to recover as damages, the tortfeasor's vehicle was an "underinsured motor vehicle" within the meaning of the Policy and Colorado law, and Plaintiff is entitled to recover UIM benefits directly from Defendant pursuant to the terms of the Policy and C.R.S. § 10-4-609.

30. Plaintiff has satisfied all conditions precedent under the Policy and is eligible to recover UIM benefits under the Policy.

### D. Defendant's Unreasonable Handling of Plaintiff's UIM Claim

31. On or about December 18, 2025, Plaintiff placed Defendant on notice of his UIM claim through a letter of representation.

32. On or about December 24, 2025, Defendant acknowledged the claim under a "full reservation of rights" and demanded Plaintiff's extensive cooperation, requesting, among many other things, a recorded statement, signed medical authorizations, employer verification, damage photographs, settlement documentation, and proof of the tortfeasor's policy limits and their exhaustion.

33. Plaintiff cooperated with Defendant's investigation, including by providing requested documentation and identifiers, providing notice of and obtaining Defendant's written consent to the underlying liability settlement, and twice offering — in his June 1, 2026 demand and again in his July 1, 2026 supplement — to provide a recorded statement and any other information Defendant might require. Upon information and belief, Defendant never took Plaintiff's recorded statement.

34. On or about June 1, 2026, Plaintiff submitted to Defendant a comprehensive UIM demand supported by Plaintiff's medical records, medical billing, and the traffic accident report, documenting total damages of $200,657.53.

35. On or about June 3, 2026, in response to questions raised by Defendant's adjuster, Plaintiff's counsel promptly submitted a written correction withdrawing $4,011.00 in radiology charges that had been included in error because they related to non-accident care, voluntarily reducing Plaintiff's claimed damages to $196,646.53 and demonstrating transparency and good faith in the presentation of the claim.

36. On or about June 10, 2026, Defendant's adjuster, Rob Wright, advised that he had reviewed the demand and, in a telephone call with Plaintiff's counsel's office that same day, extended an offer of $10,000, which the adjuster characterized as "more than reasonable given the settlement has already been made" with the tortfeasor's liability carrier.

37. In the same June 10, 2026 telephone call, the adjuster — a lay claims adjuster, not a physician — dismissed Plaintiff's care as "a lot of diagnostic treatment, diagnostic appointments," asserted that "we just don't objectively have anything" beyond "a back sprain" and "a lung contusion," and speculated that Plaintiff was "dealing with some serious diabetic issues in his foot."

38. Each of those lay characterizations is contradicted by the objective medical evidence in Defendant's own claim file, including CT-documented bilateral pulmonary contusions, a CT-documented probable nondisplaced coccyx fracture, a documented loss of consciousness, documented reduced (4/5) strength in the left upper extremity, and repeatedly documented positive objective orthopedic testing.

39. Plaintiff's demand, moreover, claimed no foot injury whatsoever. Upon information and belief, the adjuster invoked Plaintiff's unrelated diabetic comorbidity as a basis to discount documented traumatic injuries that no medical professional has attributed to diabetes.

40. Defendant's $10,000 offer is less than one quarter of Plaintiff's documented past medical expenses of $43,306.53, standing alone, and approximately five percent of Plaintiff's total documented damages.

41. On June 10, 2026, at approximately 12:04 p.m., Plaintiff's counsel's office asked Defendant in writing for a breakdown of its evaluation so that the evaluation could be presented to Plaintiff. Approximately three minutes later, at 12:07 p.m., the adjuster refused, writing: "Our offer involves a full evaluation of the objective and subjective records. There is no further breakdown to be presented. We believe our settlement offer to be extremely generous."

42. By its own words — an offer "more than reasonable given the settlement has already been made" — Defendant evaluated Plaintiff's UIM claim by reference to what Plaintiff had already recovered from the tortfeasor's carrier rather than by determining, as the Policy and Colorado law require, the amount Plaintiff is legally entitled to recover as damages for his injuries.

43. Plaintiff thereafter obtained an independent expert medical evaluation of causation and future care from Axiom Medical Consulting.

44. On July 1, 2026, at approximately 11:45 a.m., Plaintiff submitted a supplemental demand enclosing Dr. Sacksteder's signed Causation Analysis and Medical Cost Projection, updating Plaintiff's total documented damages to $199,979.53, and specifically rebutting the adjuster's "diagnostic" characterization — noting, among other things, that of Dr. Sacksteder's projected future care, only approximately $2,500 is attributable to diagnostic testing, while the remaining more than $19,000 consists of active therapeutic treatment.

45. Approximately thirty-four minutes later, at 12:19 p.m., Defendant responded in a single sentence: "Our offer to settle this remains $10000."

46. Defendant's response did not acknowledge Dr. Sacksteder's report, did not ask a single question about it, did not offer any competing analysis, and did not request any additional information. In thirty-four minutes, Defendant could not have meaningfully reviewed, much less fairly evaluated, the written causation analysis and line-item medical cost projection of a board-certified orthopedic surgeon.

47. Defendant did not obtain any independent medical examination, peer review, records review, or any medical opinion from any physician contradicting Dr. Sacksteder's causation and future-care opinions. To the extent Defendant relied upon any medical or other review to discount Plaintiff's claim, Defendant has never disclosed or produced any such opinion. Defendant's devaluation of Plaintiff's claim rests solely on a non-physician adjuster's lay characterization of Plaintiff's injuries.

48. Defendant ignored and effectively rejected the written causation and future-care opinions of a board-certified orthopedic surgeon without obtaining, or even attempting to obtain, any competing medical evidence of its own.

49. Defendant's conduct, taken as a whole, reflects a predetermined, outcome-driven evaluation designed to delay, minimize, and avoid payment of amounts owed under the Policy: Defendant fixed a $10,000 figure the same day it first discussed the demand; refused within minutes to explain it; discounted objective, CT-documented injuries based on a lay adjuster's mischaracterizations and speculation about an unrelated medical condition; anchored its

position to the underlying settlement rather than to Plaintiff's damages; and, when confronted with an independent expert report refuting its stated rationale, reaffirmed the identical offer within thirty-four minutes without analysis or explanation.

50. Defendant lacked any reasonable basis for its delay in, and refusal of, payment of the benefits owed to Plaintiff, and Defendant knew that its conduct was unreasonable or recklessly disregarded the fact that its conduct was unreasonable.

## <u>FIRST CLAIM FOR RELIEF</u>

### (Underinsured Motorist Benefits — C.R.S. § 10-4-609)

51. Plaintiff incorporates by reference each of the foregoing allegations as if fully set forth herein.

52. At the time of the July 24, 2025 collision, Plaintiff qualified as an "insured" for purposes of the Policy.

53. The Policy provides UM/UIM bodily-injury coverage obligating Defendant to pay damages for bodily injuries Plaintiff is legally entitled to recover from the owner or operator of an uninsured or underinsured motor vehicle.

54. The tortfeasor was a negligent operator of an underinsured motor vehicle for purposes of the UIM benefits owed to Plaintiff under the Policy, and the tortfeasor's available liability limits have been exhausted by a settlement made with Defendant's prior written consent.

55. Plaintiff has satisfied all conditions precedent under the Policy and is eligible to recover UIM benefits under the Policy.

56. Defendant is liable to Plaintiff for Plaintiff's injuries and damages caused by the underinsured at-fault driver, in accordance with the terms of the Policy and the provisions of C.R.S. § 10-4-609.

## <u>SECOND CLAIM FOR RELIEF</u>

### (Breach of Contract)

57. Plaintiff incorporates by reference each of the foregoing allegations as if fully set forth herein.

58. The Policy was a valid and enforceable contract of insurance, in full force and effect on the date and time Plaintiff suffered injuries in the July 24, 2025 collision.

59. Defendant unreasonably failed and refused to pay Plaintiff's claim for UIM benefits made pursuant to the Policy.

60. Defendant thereby breached its contractual duties owed to Plaintiff under the Policy.

61. As a direct and proximate result of Defendant's breach, Plaintiff has suffered damages in an amount to be proven at trial, including all damages allowed by law for breach of contract.

## THIRD CLAIM FOR RELIEF

### (Statutory Unreasonable Delay and Denial of Benefits — C.R.S. §§ 10-3-1115 and 10-3-1116)

62. Plaintiff incorporates by reference each of the foregoing allegations as if fully set forth herein.

63. Plaintiff's UIM claim is a "first-party claim" for "benefits owed directly to … a first-party claimant" within the meaning of C.R.S. §§ 10-3-1115 and 10-3-1116.

64. Defendant delayed and denied payment of benefits owed to Plaintiff without a reasonable basis, in violation of C.R.S. §§ 10-3-1115 and 10-3-1116.

65. Defendant's unreasonable conduct includes, but is not limited to:

   a. extending — and never moving from — a $10,000 offer that is less than one quarter of Plaintiff's documented past medical expenses and approximately five percent of Plaintiff's total documented damages, with no line-item analysis of Plaintiff's economic, non-economic, or physical-impairment damages;

   b. refusing, within approximately three minutes of Plaintiff's written request, to provide any breakdown of its evaluation, while proclaiming its own offer "extremely generous";

   c. discounting Plaintiff's objective, CT-documented injuries — including bilateral pulmonary contusions and a probable nondisplaced coccyx fracture — based on a non-physician adjuster's lay characterizations of Plaintiff's care as "diagnostic," of his injuries as "a back sprain" and "a lung contusion," and of his symptoms as attributable to unrelated "diabetic issues";

   d. evaluating the claim by reference to the underlying liability settlement rather than the amount Plaintiff is legally entitled to recover as damages;

    e.  ignoring the written causation and future-care opinions of Plaintiff's board-certified orthopedic surgeon and reaffirming its unchanged offer approximately thirty-four minutes after receiving his report, without analysis, question, or explanation; and

    f.  obtaining no independent medical examination, peer review, records review, or any competing medical opinion whatsoever.

66. Pursuant to C.R.S. § 10-3-1116(1), Plaintiff is entitled to recover the covered benefit plus two times the covered benefit, together with reasonable attorney fees and court costs, for Defendant's unreasonable delay and denial of Plaintiff's claim for UIM benefits.

## <u>FOURTH CLAIM FOR RELIEF</u>

### (Common-Law Bad Faith Breach of Insurance Contract)

67. Plaintiff incorporates by reference each of the foregoing allegations as if fully set forth herein.

68. Defendant owed Plaintiff a duty of good faith and fair dealing.

69. Defendant's actions, as set forth above, amounted to bad faith and unreasonable conduct under Colorado law, and Defendant knew that its actions were unreasonable or recklessly disregarded the fact that its actions were unreasonable.

70. Defendant breached its duty of good faith and fair dealing, and acted unreasonably in evaluating, investigating, negotiating, and responding to Plaintiff's UIM claim. Defendant's conduct in breach of its duty of good faith and fair dealing includes, but is not limited to:

    a.  fixing a $10,000 valuation the same day it first discussed Plaintiff's documented six-figure demand and never deviating from it, regardless of the evidence subsequently presented;

    b.  permitting a non-physician adjuster to reject documented medical diagnoses based on lay characterizations — "diagnostic" care, "a back sprain," and speculation about unrelated "diabetic issues" — that are contradicted by the CT imaging, examination findings, and diagnoses in Defendant's own claim file;

    c.  characterizing as "extremely generous" an offer amounting to less than one quarter of Plaintiff's documented past medical expenses, while refusing, within minutes of the request, to provide any breakdown or explanation of its evaluation;

    d.   anchoring its evaluation to Plaintiff's recovery from the tortfeasor's carrier rather than evaluating the amount Plaintiff is legally entitled to recover as damages, as the Policy and Colorado law require;

    e.   ignoring and effectively rejecting the written causation and future-care opinions of a board-certified orthopedic surgeon — reaffirming its unchanged offer in a one-sentence response sent approximately thirty-four minutes after the report was delivered — without retaining any physician to perform an independent medical examination, peer review, or records review, and without obtaining any competing medical opinion;

    f.   demanding Plaintiff's extensive cooperation under a full reservation of rights while never using the investigative tools it demanded, including the recorded statement Plaintiff twice offered; and

    g.   using delay, an immovable lowball offer, and a refusal to explain or engage as means to avoid payment of amounts owed under the Policy.

71. As a direct and proximate result of Defendant's unreasonable and bad-faith conduct, Plaintiff has suffered and will continue to suffer economic and non-economic damages, including all damages recoverable for common-law bad faith breach of the duty of good faith and fair dealing.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff Sonny Ward respectfully prays for judgment against Defendant The Cincinnati Indemnity Company, in an amount to be determined by the trier of fact, together with: the covered benefit plus two times the covered benefit pursuant to C.R.S. § 10-3-1116; reasonable attorney fees; costs; expert witness fees; filing fees; pre- and post-judgment interest as allowed by law; and such other and further relief as the Court deems just and proper.

### DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury on all issues so triable.

Dated: July 6, 2026

Respectfully submitted,

**CONDUIT LAW, LLC**

*/s/ Elliot A. Singer*
Elliot A. Singer (#47490)
Conduit Law, LLC
1576 Sherman St., Suite 120
Denver, CO 80203
Phone: (720) 432-7032
Facsimile: (720) 310-2224
Email: elliot@conduit.law
*Attorney for Plaintiff*

Plaintiff's Address:
2825 Urban Pl.
Berthoud, CO 80513